UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

SHRENUJ USA, LLC,

       Plaintiff,

  -v-

ROSENTHAL & ROSENTHAL, INC.,

       Defendant, Cross-Claimant, and Cross-Defendant,

  -v-

R. KLEIN JEWELRY & CO., INC., RICHARD KLEIN,

       Defendants, Cross-Claimants, and Cross-Defendants.

------------------------------------------------------------------------ X

12 Civ. 4827 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      Plaintiff Shrenuj USA, LLC ("Shrenuj") brings this action against Defendants Rosenthal & Rosenthal, Inc. ("Rosenthal"), R. Klein Jewelry & Co., Inc. ("Klein Jewelry"), and Richard Klein ("Klein"), for damages arising from Rosenthal's seizure of Klein Jewelry's inventory, which allegedly included Shrenuj's consigned goods. Plaintiff moves for summary judgment on liability against Rosenthal, for spoliation sanctions against Rosenthal, and for severance of its claims against Rosenthal from, among other things, cross-claims that Rosenthal has brought against Klein and Klein Jewelry. (Docket No. 36). For the reasons stated below, Plaintiff's motion for partial summary judgment is DENIED, its motion for spoliation sanctions is GRANTED (although the Court defers the question of what sanction to impose until trial), and its motion for a severance is GRANTED in part and DENIED in part.

1

**BACKGROUND**

The following facts — derived from Shrenuj's Amended Complaint (Docket No. 20) ("AC"), Rosenthal's Answer and Cross-Claims (Docket No. 22) ("Rosenthal's Cross-Claims"), Klein Jewelry and Klein's Answer and Cross-Claims (Docket No. 25) ("Klein Jewelry's Cross-Claims"), and the admissible material the parties submitted on this motion — are viewed in the light most favorable to Rosenthal, the non-moving party. *See, e.g.*, *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 157-58 (2d Cir. 2012).

**A.   The Agreements**

Klein is an officer and shareholder of Klein Jewelry, a jewelry distributor involved in holding and selling consignment goods, with its principal office located in Rockville Centre, New York. (AC ¶ 3, at 2, ¶ 2, at 3; Declaration of Michael S. Horn (Docket No. 38) ("Horn Decl."), Ex. 27 ("Klein Depo."), at 17-18). Klein Jewelry also manufactured and sold its own jewelry, which bore a Klein Jewelry trademark. (Klein Depo. 16). Rosenthal, a factoring and finance company, provided credit to Klein Jewelry. (AC ¶ 3, at 3). On September 28, 2006, Rosenthal, Klein Jewelry, and HSBC Bank USA ("HSBC") entered into a financing agreement, pursuant to which HSBC agreed to provide gold bullion to Klein Jewelry on a consignment basis. (Rosenthal's Cross-Claims ¶ 6, at 12; Horn Decl., Ex. 1; Declaration of Kieran X. Bastible (Docket No. 47) ("Bastible Decl."), Ex. A). Rosenthal, in turn, "agreed to place all orders to HSBC for the [c]onsigned [g]old on Klein Jewelry's behalf" and "unconditionally guaranteed all of Klein Jewelry's obligations." (Rosenthal's Cross-Claims ¶ 6, at 12). In exchange, Klein Jewelry granted Rosenthal a security interest in all of its owned and thereafter acquired property and assets, and their proceeds. (Bastible Decl., Ex. A ¶ 5.1). In November 2009, Rosenthal filed a UCC-1 financing statement, dated October 22, 2009, to perfect a lien on

2

that property.  (Horn Decl., Ex. 23 ("Occhiogrosso Depo."), at 51-58).  (Rosenthal later filed continuation statements.  (*Id.* at 80).)

On October 15, 2009, Klein Jewelry entered into a consignment agreement with Shrenuj, a wholesale diamond and jewelry business.  (AC ¶ 4, at 3).  The Purchase Money Security Agreement on Goods between the two parties provided that Shrenuj held title to the goods it consigned to Klein Jewelry, was the sole owner of those goods, and that Klein Jewelry would not create any lien or security interest in the goods without the written consent of Shrenuj.  (*Id.* ¶ 5, at 3).  If Klein Jewelry violated their agreement, Shrenuj could take possession of the consigned goods and receive reimbursement for reasonable expenses, including reasonable attorney's fees and court costs.  (*Id.* ¶ 7, at 3).  On October 22, 2009, Shrenuj filed a UCC-1 Financing Statement with the New York Secretary of State for all of Shrenuj's consigned goods.  (*Id.* ¶ 9, at 4; Horn Decl., Ex. 2, at 1-2).  Rosenthal was informed of both the consignment agreement and the UCC-1 financing statement via letter on November 3, 2009.  (AC ¶ 10, at 4; Horn Decl., Ex. 2, at 8-9).  Thereafter, Shrenuj shipped jewelry — worth at least $62,042.55 — to Klein Jewelry, which placed those goods on consignment.  (Horn Decl., Ex. 2, at 5; *see also* AC ¶ 13, at 4 (stating that $77,553.19 worth of goods "remain on consignment" with Klein Jewelry)).  According to Atit Shah — the general manager of Shrenuj — at least "a majority" of the goods bore Shrenuj's trademark stylized "S" logo.  (Horn Decl., Ex. 26 ("Shah Depo."), at 7, 70-74).  Klein Jewelry was to hold the jewelry until it was sold or until it was held for some specified period of time.  (*See id.* at 103-05).  Under the agreement, Klein Jewelry was not required to pay Shrenuj for any of the consigned goods unless and until it was able to sell the goods.  (Klein Depo. 73-74).

**B.      Rosenthal's Seizure of Klein Jewelry's Inventory**

Rosenthal conducted periodic audits of Klein Jewelry's inventory and records to ensure that it was complying with the terms of their financing agreement. (Klein Depo. 26-27; Rosenthal's Cross-Claims ¶¶ 16, 19, at 13-14). In late August or early September 2011, a team of Rosenthal employees conducted such an audit and discovered a significant shortage of gold bullion — worth more than one million dollars. (*Id.* ¶ 19, at 14; Def. Rosenthal's Mem. Law Opp'n (Docket No. 46) ("Def.'s Mem. Law") 4). Over the next two weeks, Rosenthal employees sorted the goods in Klein Jewelry's inventory to confirm the shortage. (Horn Decl., Ex. 25 ("Corcoran Depo."), at 40-42). In a demand and default letter dated September 14, 2011, Rosenthal then notified Klein Jewelry and Klein that (1) Klein Jewelry was in default of the financing agreement; (2) based on that default, Rosenthal was terminating the agreement; and (3) Rosenthal demanded full payment of amounts due under the financing agreement and gold consignment agreement. (Rosenthal's Cross-Claims ¶ 21, at 14).

Rosenthal then confiscated Klein Jewelry's inventory. (AC ¶ 14, at 4; Klein Jewelry's Cross-Claims ¶ 1, at 9). According to Michael Corcoran, the Rosenthal employee who led the verification and seizure process, Klein Jewelry's inventory had "no organization" (Corcoran Depo. 46); only some jewelry items had item numbers, noted on a bag or tag. (*Id.* 43, 47; *see also* Klein Depo. 21-22 (explaining that consigned goods were commingled with other goods and that "every single" item from consignors like Shrenuj should have had a tag with prefix and number)). Klein Jewelry did, however, maintain inventory records of consigned goods, which identified each jewelry item with a code and noted whether the item had been shipped to a vendor. (Horn Decl., Ex. 3; *see also* Klein Depo. 63-64). Klein Jewelry designated Shrenuj's consigned goods with an "SH" prefix followed by a series of numbers or letters. (Horn Decl.,

4

Ex. 3; *see also* Klein Depo. 63-64).  Corcoran, however, claimed that he and his team "never saw inventory records" at Klein Jewelry and that Klein never explained the meaning of the item codes; in addition, he did not recall whether he saw any "SH" bags or tags.  (Corcoran Depo. 27, 43, 72-73).  Indeed, according to Corcoran, when asked for any relevant records, Klein responded that he was unable to provide any.  (*Compare* Corcoran Depo. 43; Occhiogrosso Depo. 34, *with* Klein Depo. 50-51).

During the seizure process, Rosenthal's employees examined each item of jewelry for karat amount, removed tags, and sorted the jewelry into piles based on weight; they did not photograph the items or videotape the seizure.  (Corcoran Depo. 45).  According to Corcoran, the Rosenthal employees also examined each item for markings; he testified that he does not recall seeing any such markings or trademarks, including Shrenuj's trademark "S" logo.  (*Id.* at 45, 48-49; *see also* Def.'s Mem. Law 8-9).  Based on this process, Rosenthal prepared records identifying each item of jewelry by weight and short description.  (Horn Decl., Ex. 4).  Corcoran testified that, in preparing those records, "if [the employees] had an item number, [they] included the item number," but if they could not identify such a number, they "put a description of what the item was."  (Corcoran Depo. 45).  Notably, some of the item numbers in Rosenthal's records include the prefix "SH" (Horn Decl., Ex. 4, at 7), but Shrenuj suggests that those items corresponded to Klein Jewelry's own labeling system, which — as noted — identified Shrenuj goods by using an "SH" prefix on its labels.  (Mem. Law Supp. Mot. Summ. J., Mot. Sanctions, and Mot. Severance (Docket No. 37) ("Pl.'s Mem. Law") 14-15; *see also* Klein Depo. 63-65).  Corcoran, however, testified that the six or seven items that said "'SH' on [Rosenthal's] records" might have corresponded to "*some* information that [the team] had available to [them]" from Klein Jewelry's tags, bags, or other labels.  (Corcoran Depo. 74 (emphasis added); *see also id.*

5

72-73). But Corcoran could not recall what similar prefixes — such as "SR" or "S" — meant. (*Id.* at 75). Curiously, a comparison of the item numbers on Klein Jewelry's list of Shrenuj's consigned goods and Rosenthal's records reveals that no "SH" item number in Klein's records overlaps with any "SH" item number in Rosenthal's records. (*Compare* Horn Decl., Ex. 3, *with* Horn Decl., Ex. 4, at 7).

The Rosenthal team did, however, identify a number of items as consigned and placed those items in a box labeled "Memo." (Horn Decl., Ex. 28 ("Kirschenbaum Depo."), at 141-142). Klein testified that he reminded Rosenthal employees multiple times about the need to return consigned goods. (Klein Depo. 35, 49). In an e-mail dated September 13, 2011, Klein advised Rosenthal that "the vendors that have consigned goods" had been asking whether their goods would be returned. (Horn Decl., Ex. 5). But Rosenthal disputes whether Klein ever reminded the Rosenthal team that the seized inventory included consigned goods, provided a list of such goods, or disclosed that Shrenuj's consigned goods were protected by a UCC filing. (Def.'s Mem. Law 5, 9. *Compare* Klein Depo. 35, 49, *with* Horn Decl., Ex. 24 ("Bobby Depo."), at 29-30; Corcoran Depo. 43; Occhiogrosso Depo. 34). In any event, the goods were eventually placed in bank bags and were transported and given to David Kirschenbaum, an outside contractor whom Rosenthal retained to liquidate the inventory. (Occhiogrosso Depo. 38-39).

### C.     Rosenthal's Liquidation of the Seized Goods

Immediately following the seizure, Rosenthal neither conducted a UCC search nor contacted the companies that had provided Klein Jewelry with consigned jewelry. (Occhiogrosso Depo. 39, 43-44, 50-51). Instead, Rosenthal began a liquidation process, led by Kirschenbaum, in which the goods were first weighed, examined for markings and qualities, and bagged. (Kirschenbaum Depo. 41-42). Kirschenbaum testified that he examined all of the

jewelry through a "loop" — or "loupe," a magnifying tool used by jewelers — and that he did not see Shrenuj's stylized "S" trademark; had he seen that trademark, he asserted, he would have set the jewelry aside.  (Kirschenbaum Depo. 141-142).  Within a few weeks, Rosenthal instructed Kirschenbaum to begin selling the seized goods and to send any goods that could not be sold to be melted.  (Occhiogrosso Depo. 41; Kirschenbaum Depo. 46, 51).

Throughout that period, General Manager Shah and other Shrenuj representatives repeatedly contacted Rosenthal to recover Shrenuj's consigned goods.  (Horn Decl., Ex. 6).  Shah testified that James Occhiogrosso, who works for Rosenthal in the asset-based lending group, informed him that Rosenthal was conducting a verification process on the inventory and that, once it had finished with that process, it would return the consigned goods to Shrenuj.  (Shah Depo. 80-84).  During that period, Shah left telephone messages for Occhiogrosso about once every week; the two actually spoke on September 26, 2011, and November 10, 2011.  (Shah Depo. 85-89).  In addition, on December 27, 2011, Rosenthal "got the UCC searches back," which confirmed that "there [was] a UCC lien for Shrenuj USA, LLC."  (Occhiogrosso Depo. 80-83).

On January 6, 2012, Shrenuj's counsel sent a letter to Rosenthal seeking to reclaim its consigned goods, demanding that those goods not be commingled with others, and providing a list of Shrenuj's consigned goods and an additional copy of the UCC filing.  (Horn Decl., Ex. 12).  Rosenthal neither informed Shrenuj that additional information was needed to locate its consigned goods, nor that it could inspect the seized inventory.  (Shah Depo. 85-89).  On January 13, 2012, Shrenuj's counsel advised Rosenthal in an e-mail that "there may [be] spoliation of evidence issue[s] especially in the face of the statement and testimony of R. Klein employee that says you took Shrenuj goods over their advice."  (Horn Decl., Ex. 13).  In a letter dated January

27, 2012, Rosenthal's general counsel informed Shrenuj's counsel that Rosenthal did not have a detailed inventory of what it took from Klein Jewelry's inventory and that, if Shrenuj "pursue[d] this matter any further," Rosenthal's "full intention" was "to vigorously defend [its] rights." (Horn Decl., Ex. 14).  That letter attached a one-page summary of the inventory, but not the more detailed list that Rosenthal's employees had created during the seizure.  (*Id.*).  In a February 14, 2012 letter, Shrenuj's counsel demanded that the remaining evidence be preserved.  (Horn Decl., Ex. 15).  In an e-mail to Shrenuj's counsel the same day, an associate general counsel for Rosenthal asserted that Rosenthal "will vigorously defend [its] rights in any litigation." (Horn Decl., Ex. 16).

Despite Shrenuj's warnings, Rosenthal did not cease selling or melting the seized goods. (Occhiogrosso Depo. 92-93; Kirschenbaum Depo. 94-95).  In fact, it continued disposing of the jewelry until February 2013.  (Kirschenbaum Depo. 94-95).  By that point, Klein Jewelry's entire inventory was either sold or melted.  (Horn Decl., Ex. 18; *see also* Pl.'s Mem. Law 4, 13; Pl.'s Mem. Law Reply Def.'s Opp'n (Docket No. 49) 1).

**D.    The Litigation**

On June 19, 2012, Shrenuj filed the instant action against Rosenthal, Klein Jewelry, and Klein.  (Compl. (Docket No. 1)).  In its Amended Complaint, filed on November 30, 2012, Shrenuj brings a breach-of-contract claim against Klein Jewelry (AC 6-7); claims for conversion (*id.* at 7-8), recovery of the reasonable value of goods (*id.* at 8-9), unjust enrichment (*id.* at 9-10), and replevin (*id.* at 10) against all three defendants; and a claim under Article 9 of the Uniform Commercial Code against Rosenthal and Klein Jewelry (*id.* at 10-11).  On December 18, 2012, Rosenthal filed cross-claims against Klein Jewelry and Klein for breach of the financing agreement and breach of the guaranty, respectively, seeking $1,280,831.51 from each.

(Rosenthal's Cross-Claims 15-16). On January 2, 2013, Klein Jewelry and Klein also filed cross-claims against Rosenthal alleging that Rosenthal had breached the financing agreement and was wrongfully in possession of consigned goods. (Klein Jewelry's Cross-Claims 9-10). On April 18, 2013, Shrenuj and Rosenthal were advised that Klein had filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code. (Horn Decl., Ex. 22). As a result, both Shrenuj's claims and Rosenthal's cross-claims against Klein are automatically stayed. *See* 11 U.S.C. § 362(a). Klein Jewelry, however, has not declared bankruptcy, so the claims against it have not been stayed.

## DISCUSSION

As noted, Shrenuj moves for partial summary judgment (namely, as to liability) against Rosenthal, for spoliation sanctions against Rosenthal, and for a severance. (Docket No. 36). The Court will address each aspect of the motion in turn.

**A.   Summary Judgment**

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an

9

essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on summary judgment motion, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To defeat a summary judgment motion, however, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In turn, the non-moving party cannot "defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

Applying those standards here, and upon due consideration of the parties' motion papers, Plaintiff's motion for summary judgment is DENIED.  Shrenuj has a strong argument that, to the extent its consigned goods were among those Rosenthal seized from Klein Jewelry, Rosenthal should be held liable for its losses due to Rosenthal's failure to provide Shrenuj with timely notice of the seizure and failure to preserve or give Shrenuj access to the goods.  But in order to establish liability, Shrenuj must establish injury — that is to say, it must establish that at least *some* of its consigned goods were among those Rosenthal seized.  *See, e.g.*, *Parks v. Baldwin Piano & Organ Co.*, 262 F. Supp. 515, 519 (D. Conn. 1967), *aff'd*, 386 F.2d 828 (2d Cir. 1967) ("Since the [repossession of consigned goods] complained of by plaintiff involved no legal

impropriety on the part of defendants, there is no legal injury."). And because the goods themselves have been sold or destroyed, and Klein Jewelry's records are less than perfect, there is no unimpeachable evidence of whether (or to what extent) Shrenuj's consigned goods were among those that Rosenthal seized and dissipated. Further, in the absence of such evidence, there are material disputes of fact on that issue.

For example, although Klein testified that he provided Rosenthal with a list of Shrenuj's consigned goods in Klein Jewelry's inventory (Klein Depo. 50-51; Pl.'s Mem. Law 3), there is testimony in the record that Klein was asked for records about consigned goods and was unable to provide any (Corcoran Depo. 43; Occhiogrosso Depo. 34; Bobby Depo. 29-30). Similarly, although Klein stated that, during the seizure process, he saw some of Shrenuj's consigned goods (Klein Depo. 24-25; *see also* Shah Depo. 70-74), Corcoran testified that "each piece of jewelry repossessed was examined through a loop, and no Shrenuj logo was *ever* seen on any of the goods." (Def.'s Mem. Law 8; Corcoran Depo. 54, 84). Like Corcoran, Kirschenbaum, the outside contractor whom Rosenthal retained to liquidate the inventory, testified that upon the inventory's arrival, he sorted and examined each piece through a loop and did not see Shrenuj's logo; if he had seen such a logo, he claimed, he would have set those pieces aside. (Kirschenbaum Depo. 141-42).

Rosenthal did keep records during both the inventory and liquidation process, but the parties dispute the accuracy and meaning of those records. For example, Rosenthal prepared an inventory of goods seized (Horn Decl., Ex. 4), but the entries for jewelry items use inconsistent nomenclatures. A particular entry might identify a piece of jewelry solely by using either a bland description ("Charms With Stones, Tags") or an identification code ("AST3/MTG4"). (Horn Decl., Ex. 4). The codes themselves might have proved useful, despite their inconsistent

11

use, but the parties even dispute the meaning of those codes — most significantly, the significance, if any, of those beginning with "SH." Shrenuj claims those codes refer to its goods, while Rosenthal claims they do not. (*Compare* Horn Decl., Ex. 3, *with id.* Ex. 4, at 7, 8; Klein Depo. 63-64). Last, Rosenthal did prepare invoices for each item of jewelry sold, but they offer even less by way of identification than the inventory records. (Horn Decl., Ex. 18).

In short, Plaintiff may well have a strong case at trial with Klein's testimony and the SH codes, but it is the role of the jury, not of the Court, to assess credibility and weigh conflicting evidence. *See, e.g.*, *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (internal quotation marks omitted)). Given the absence of clear testimony or records about exactly what was seized, and given that the Court must draw all reasonable inferences in the non-moving party's favor, the Court does not have a basis on which to grant summary judgment to Shrenuj. The motion is therefore DENIED.

**B.     Spoliation of Evidence**

The Court's central reason for denying summary judgment — that, with Rosenthal's sale and destruction of Klein Jewelry's inventory, the evidence of whether that inventory included any of Shrenuj's consigned goods is disputed — is the basis for Shrenuj's next motion, for spoliation sanctions. (Pl.'s Mem. Law 16-21). "Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)). Where a party seeks sanctions based on the spoliation of evidence, it must establish that (1) the party having control over the evidence had an obligation to preserve it at the

12

time it was destroyed; (2) the evidence was destroyed "with a culpable state of mind"; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). "'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.'" *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

Exercising its discretion, the Court concludes that spoliation sanctions are warranted in this case. With respect to the first requirement, Shrenuj has shown that Rosenthal had an obligation to preserve the inventory at the time that it (or at least some of it) was destroyed. Such an obligation "arises when a party reasonably anticipates litigation." *Orbit One Commc'ns*, 271 F.R.D. at 436 (internal quotation marks omitted). Here, almost immediately after the seizure, Shah left weekly phone messages for Occhiogrosso and had two telephone conversations with him in September and November 2011. (Shah Depo. 85-89). Whether or not Rosenthal should have anticipated litigation from those communications alone, Rosenthal was plainly on notice of the potential for litigation no later than January 6, 2012, when Shrenuj's counsel sent Rosenthal a letter seeking to reclaim its consigned goods. (Horn Decl., Ex. 12). The next week, Shrenuj's counsel expressly advised Rosenthal of the need to avoid spoliation of evidence. (Horn Decl., Ex. 13). And on February 14, 2012, Shrenuj's counsel sent a letter to Rosenthal demanding that the remaining evidence be preserved and that Shrenuj have an opportunity to inspect and photograph any remaining evidence. (Horn Decl., Ex. 15). From those communications, Rosenthal knew — and certainly should have known — that litigation was likely, yet it continued to sell and destroy the evidence at issue. In fact, it continued to do so

even after June 19, 2012, when Shrenuj filed its Complaint in this action.  (Kirschenbaum Depo. 94-95).

Second, in light of the communications from Plaintiff's counsel, the Court easily finds that Rosenthal sold or destroyed the evidence "with a culpable state of mind."  Significantly, "[i]n this circuit, a 'culpable state of mind' . . . includes ordinary negligence."  *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 290 (S.D.N.Y. 2009) (quoting *Residential Funding*, 306 F.3d at 108); *see also, e.g.*, *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267-68 (2d Cir. 1999).  That is, courts have found that "evidence of intentional destruction," as opposed to a mere accident, is sufficient to warrant sanctions.  *Byrnie*, 243 F.3d at 109 (citing *Reilly*, 181 F.3d at 267).  In this case, Rosenthal's sale and destruction of the evidence was plainly intentional — and arguably rose to the level of gross negligence.  Within a few weeks of the seizure, Rosenthal instructed Kirshenbaum to begin selling the seized goods and to melt any goods that could not be sold.  (Occhiogrosso Depo. 40-42).  Further, as noted, Rosenthal gave Kirschenbaum those instructions even after Plaintiff and its counsel had communicated the need to preserve the inventory.  (Horn Decl., Ex. 6; Shah Depo. 80-89).  Notably, Rosenthal does not truly contest that its sale and destruction of the inventory was intentional.  Accordingly, the second requirement for spoliation sanctions is satisfied.

Finally, the destroyed evidence was "relevant" to Plaintiff's claims.  In this context, "relevance means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence."  *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 411 (S.D.N.Y. 2010) (internal quotation marks omitted); *see also Residential Funding*, 306 F.3d at 108-09.  That is, to be relevant, the evidence "must be of the sort that a reasonable jury could find harmful to the spoliator's case."  *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of*

14

*N.Y. & N.J.*, 601 F. Supp. 2d 566, 570 (S.D.N.Y. 2009). Relevance "may be inferred if the spoliator is shown to have a sufficiently culpable state of mind." *Passlogix*, 708 F. Supp. 2d at 411 (internal quotation marks omitted). In the absence of at least gross negligence, the moving party must "submit extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it." *Id.* at 412; *see also Byrnie*, 243 F.3d at 108 ("[T]he burden falls on the prejudiced party to produce some evidence suggesting that a document or documents relevant to substantiating [its] claim would have been included among the destroyed files." (internal quotation marks omitted)). Here, as discussed above, Plaintiff has produced "some evidence" suggesting that evidence relevant to substantiating its claims would have been included among the inventory sold or destroyed by Rosenthal — namely, the evidence discussed above tending to show that that inventory included some of its consigned goods. To be sure, that evidence is disputed — as a result of which, the Court could not grant summary judgment — but it is sufficient to carry Plaintiff's burden of showing that a reasonable fact finder could conclude that the missing evidence was unfavorable to Rosenthal.

In short, although sanctions are a "last resort," *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* No. 04 Civ. 5316 (RMB), 2006 WL 2807213, at *6 (S.D.N.Y. Sept. 28, 2006), they are indeed warranted in this case. As for what those sanctions should be, the law is clear that appropriate sanctions should be tailored according to "the prejudice suffered by the party seeking sanctions," and "the severity of the sanctions imposed should be congruent with the destroyer's degree of culpability." *Richard Green (Fine Paintings)*, 262 F.R.D. at 292, 288 (internal quotation marks omitted). "Ultimately, the determination whether to award sanctions for spoliation of evidence" — and thus the sanction itself — "is a highly fact-specific inquiry." *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 294

(S.D.N.Y. 2011).  In this case, however, the Court will be in a better position to engage in this fact-specific inquiry after hearing the evidence at trial.  If that evidence shows that Rosenthal disposed of the inventory in bad faith, or that Plaintiff's consigned goods were indeed part of the inventory, some form of adverse inference may be warranted.  More likely, an appropriate sanction would be to require Rosenthal to pay some or all of Plaintiff's attorney's fees and costs for pursuing this case, on the theory that, had the evidence been preserved, the parties could have easily and definitively resolved whether and to what extent the inventory included Shrenuj's consigned goods, in which case litigation would have been unnecessary.  *See, e.g.*, *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (explaining that "[t]he sanction should be designed," among other things, to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party" (internal quotation marks omitted)).  Accordingly, the Court defers the question of sanction to impose until trial, at which point the Court will hold an evidentiary hearing if necessary.  *See, e.g.*, *Cohalan v. Genie Indus., Inc.*, No. 10 Civ. 2415 (JMF), 2013 WL 829150, at *9 (S.D.N.Y. Mar. 1, 2013) (deferring until trial the question of whether an adverse inference instruction was warranted based on the spoliation of evidence).

**C.     Severance**

Finally, Plaintiff moves for a severance, in part based on the bankruptcy stay with respect to the claims against Klein and in part based on its contention that Rosenthal's cross-claims are "independent" of its claims.  (Pl.'s Mem. Law 21-23).  To the extent that Plaintiff seeks to sever all claims against Klein from the rest of the case, the motion is granted because the claims against Klein are stayed and there is no reason to delay trial on the remaining claims.  Beyond that, it is not entirely clear whether Plaintiff seeks also to sever claims against Klein Jewelry,

including its own claims, or whether it merely seeks to sever Rosenthal's cross-claims. In either case, however, its motion is denied. Under Rule 42(b) of the Federal Rules of Civil Procedure, a district court has broad discretion to "order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims" in order to promote "convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b); *see Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (stating that district courts have "broad discretion to order separate trials"). Here, there is no compelling reason to sever any of the claims not subject to the bankruptcy stay, as those claims are all inextricably intertwined. To be sure, Rosenthal's claims against Klein Jewelry are "independent" of Plaintiff's claims against Rosenthal and Klein Jewelry insofar as they relate to the financing agreement, but any trial of Plaintiff's claims would involve evidence concerning the financing agreement, and Klein Jewelry's compliance (or lack of compliance) with it, as that is necessary to explain Rosenthal's seizure of the inventory in the first place. Put simply, the downsides of trying all claims not subject to the stay together are minimal, and are certainly outweighed by the inefficiency of holding two separate trials.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is DENIED, its motion for spoliation sanctions is GRANTED (except that the Court defers the question of what sanction to impose to the time of trial), and its motion for a severance is GRANTED in part and DENIED in part. Specifically, the claims against Klein, which are stayed by virtue of his bankruptcy, are severed from the other claims and cross-claims, which shall be tried together.

The parties shall immediately advise the Court by joint letter if they are interested in having a settlement conference before the assigned Magistrate Judge for purposes of settlement.

Regardless, **within thirty days** of this Memorandum Opinion and Order, the parties shall submit to the Court for its approval a Joint Pretrial Order prepared in accordance with Federal Rule of Civil Procedure 26(a)(3) and the Court's Individual Rules and Practices. The parties should follow Paragraph 5 of the Court's Individual Rules and Practices, which identifies submissions that must be made at or before the time of the Joint Pretrial Order, including any motions *in limine*. At or before the same date, the parties shall also file joint requests to charge, joint proposed verdict forms, and joint proposed *voir dire* questions in accordance with the Court's Individual Rules and Practices. Jury instructions may not be submitted after the Joint Pretrial Order due date, unless they meet the standard of Federal Rule of Civil Procedure 51(a)(2)(A). The parties shall be ready for trial approximately two weeks after the Joint Pretrial Order is filed.

The Clerk of Court is directed to terminate Docket No. 36.

SO ORDERED.

Dated: March 25, 2014
       New York, New York

_____
JESSE M. FURMAN
United States District Judge